## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

JONATHAN H. PARDEE,
Carol Havican as TRUSTEE of the
JONATHAN H. PARDEE CHARITABLE
REMAINDER TRUST

      Plaintiffs,

      v.                            C.A. 01-594L

CONSUMER PORTFOLIO SERVICES, INC.,

      Defendant.
_____

CONSUMER PORTFOLIO SERVICES, INC.

      Counterclaimant Plaintiff,

      v.

JONATHAN H. PARDEE, Carol Havican
as TRUSTEE of the JONATHAN H. PARDEE
CHARITABLE REMAINDER TRUST,
ODGEN H. SUTRO, DUNBAR/WHEELER TRUST,

      Counterclaim Defendants.


### DECISION AND ORDER


      This matter comes before the Court on Plaintiffs' Motion for
Summary Judgment, seeking judgment in their favor on their Second
Amended Complaint ("Complaint"), as well as judgment in their
favor on Defendant's counterclaims.  Defendant has cross-moved
for summary judgment on Plaintiffs' Complaint.  These motions
address issues of liability only, the Court having previously

granted Plaintiffs' motion to bifurcate the issues of liability and damages.

Plaintiffs bring their Complaint in order to enforce an indemnity agreement that was part of a 1997 business transaction resulting in the sale of a company owned by Plaintiff Jonathan H. Pardee ("Pardee") and others to associates of Defendant. Defendant served as conditional indemnitor for the transaction. However, Defendant now asserts that, pursuant to the terms of the parties' agreement, it is not required to indemnify Plaintiffs, and that, moreover, the agreement is invalid because of misrepresentations made by Plaintiffs at the time of the transaction.  For reasons that will be explained below, the Court grants Plaintiffs' Motion for Summary Judgment, holding that the indemnification agreement is not only valid, but enforceable against Defendant.

## Background

It is necessary to delve into a past century in order to explain important aspects of this case, which begins in the 1970s with some two hundred personal injury victims in California. Tortfeasors entered into structured settlements with these injury victims (hereinafter "Settlement Payees") in order that the Settlement Payees could receive their awards in periodic installments.  The tortfeasors made one-time, lump-sum payments and turned the administration of the structured settlements over

to an assignment company set up for this purpose.  The assignment company changed names and ownership over time – when owned by Plaintiff Pardee, it was called Settlement Services Treasury Assignments, Inc., or SSTAI; however, for convenience, all incarnations (prior to the 1997 sale) will be identified herein as "the Assignment Company."  In exchange for a one-time commission, the Assignment Company established an individual trust for each Settlement Payee, invested the settlement monies in various financially-conservative vehicles, and was thereafter responsible for making payments to the Settlement Payees on a periodic basis.  The Assignment Company was contractually obligated to hold the settlement proceeds in irrevocable, spendthrift trusts that could not be sold, pledged or encumbered. Most of the settlement monies were invested in United States Treasury Bonds, specifically selected to match maturity dates with the schedule of settlement payments.  Alternative funding instruments included Treasury Investment Growth Receipts or "TIGR bonds."  The legal arrangement, as memorialized by the various settlement, trust and assignment agreements, was that a single bank served as trustee and the Assignment Company was the trustor and sole beneficiary of the trusts, while the Settlement Payees were general creditors of the Assignment Company.  This arrangement provided advantages for all parties: the tortfeasor entities were released from ongoing liability to the Settlement

-3-

Payees; the irrevocable trusts holding low-risk financial
instruments provided long-term security for the Settlement
Payees; and both sides enjoyed tax advantages enacted by Congress
to encourage these kinds of settlements.  In 1982, the Assignment
Company created a single master trust Agreement to facilitate its
administration of the structured settlements.

### *Pardee's involvement*

In 1991, the Assignment Company brought a lawsuit in Los
Angeles Superior Court to remove Wells Fargo Bank as trustee for
the various trusts.  In the course of that litigation, the court
ruled twice that the Assignment Company did not have the power to
remove Wells Fargo as trustee without the consent of the
Settlement Payees.  While the Assignment Company's appeal of
those rulings was pending, an agreement was reached by the
parties pursuant to which Wells Fargo resigned as trustee – with
no notice to the Settlement Payees.  Also in 1991, Pardee became
an officer of the Assignment Company, and the Providence law firm
then known as Hinckley, Allen & Snyder ("Hinckley Allen") became
its legal counsel.  At this time, because the Assignment Company
was not entering into new structured settlement arrangements, it
had no source of income beyond what was allocated for payments to
the Settlement Payees. The Assignment Company was essentially in
run-off.

Late in 1991, Pardee became majority shareholder of the

-4-

Assignment Company when he purchased the stock for $1.   U.S.
Trust Company became the new trustee.   A new master trust
agreement was created, superceding all previous trust agreements.
This master trust agreement included some important changes: gone
were all provisions stating that the trusts were irrevocable; and
new language was inserted permitting the Assignment Company to
receive a portion of the Trustee's fee.

During 1993, Pardee, along with Hinckley Allen, began to
explore the idea of using, or "harvesting," the excess equity
earned by the trust assets as collateral to secure loans for
other enterprises.   When U.S. Trust Company refused to go along
with this plan, Pardee replaced it as trustee with Bankers Trust
Company of New York ("Bankers Trust").   Trustor and trustee then
ironed out a new master trust agreement, superceding all previous
trust agreements.

The 1994 Master Trust Agreement omitted all references to
the settlement agreements and to the orders to make payments to
the Settlement Payees, stating only that payments should be made
from the trust "to the persons and at the times set forth in the
instructions delivered to the Trustee by the Trustor."   Moreover,
the trustor was authorized to direct the trustee to pay over to
the trustor money deemed by the trustor to be excess of that
necessary to satisfy the trustor's obligations.   Another
important change in the 1994 Master Trust Agreement was a

-5-

provision enabling the Assignment Company to borrow money using the trust assets as collateral, and to use the loans for the benefit of other enterprises.[1]  The revised Trust Agreement gave the Assignment Company full discretionary power to amend or terminate the trust at any time.

As a result of these changes, the Assignment Company was able to sell the Treasury Bonds to Morgan Stanley in exchange for a line of credit, entering into repurchase agreements whereby Morgan Stanley would essentially hold the bonds until the Assignment Company exercised its right to buy them back at a slightly higher price.  In addition, during this time period, Pardee liquidated the TIGR bonds, which had been held by the Assignment Company for the purpose of making payments to certain of the Settlement Payees.  According to Defendant, the sale of the TIGR bonds left the Assignment Company underfunded by $1.4 million, in terms of its obligation to the Settlement Payees. Additionally, because of its new-found borrowing power, the Assignment Company changed the way its remaining assets were valued for accounting purposes – a change that increased the Company's stockholder equity from just over $1 million to $24.7 million over a three-month period.  The Settlement Payees never

---

[1] Taking advantage of this modification, Pardee loaned his wholly-owned investment company, Bellevue Capital Ventures, $5 million around 1994.  This amount was repaid to the Assignment Company in 1997, though not necessarily by Bellevue.

consented to, nor were they ever even notified of any of these transactions or of any of the changes to the structure and practices of the Assignment Company.  Notwithstanding these changes, the Assignment Company consistently fulfilled its payment obligations to the Settlement Payees.

In 1996, the Assignment Company shareholders worked with investment bank Bear Stearns & Co. to market the Assignment Company for sale.  In its Marketing Summary, Bear Stearns described the Assignment Company as being in "run-off mode." The first paragraph reads:

> SSTAI was founded in 1969 to primarily satisfy defendants' obligations to payees under legal settlement of various insurance claims.  The Company is required to make periodic and lump sum payments to payees for periods between one and thirty years.  The Company's future payment obligations are fully funded by a portfolio of US Treasury Bonds.  These securities provide for the future payment obligations because payments on the bonds are matched to the amounts due payees.

Still on the first page, the Summary states, "Because the Company has not acquired new business since 1992, any acquisition should be viewed as a purchase of high quality, highly liquid and flexible assets, primarily US Treasury Bonds."  The "professional responsibility" of any potential buyer was stressed as a special consideration, due to the fact that the "securities are tied to vehicles intended to provide injured claimants with security."

Bear Stearns soon recommended potential buyers: Charles E. Bradley, Sr., and his son, Charles E. Bradley, Jr., from Connecticut.  Bear Stearns prepared a detailed analysis of the Assignment Company's assets and liabilities for the Bradleys' review.  The Bradleys owned several other companies and financial interests, including Defendant Consumer Portfolio Services, Inc., ("CPS"), of which Bradley Sr. was a 25% owner and served as chairman of the board, while Bradley Jr. was president and chief executive officer.  The Bradleys were interested in the Assignment Company as a source of liquid capital, particularly for CPS, a publicly-traded consumer car financing business.

The Bradleys hired a Providence law firm, Cameron & Mittleman, to review the Assignment Company's records, including the original settlement agreements with the Settlement Payees, the assignment agreements, and all versions of the trust agreements (the "Settlement Documents").  According to Plaintiffs, two attorneys from Cameron & Mittleman, accompanied by both Bradleys, spent five days in the Assignment Company's office inspecting its files.

Although the Bradleys' attorneys had access to virtually all the Assignment Company's documentation, Defendant now asserts that they were only able to conclude that the more recent master trust agreements *appeared* to be consistent with Plaintiffs' representations.  Moreover, Defendant presently complains that

-8-

the Bradleys' attorneys did not have access to Hinckley Allen's legal files, which Defendant has since seen in the course of the discovery for other related litigation.  According to Defendant, these documents reveal Hinckley Allen's research and analysis about the propriety of the ongoing modifications to the Trust Agreements. Access to these files would also have revealed the Plaintiffs' and their attorneys' concerns about whether or not the Settlement Payees might be deemed third-party beneficiaries of the trusts to whom the Assignment Company could owe a legal duty; the sale of the TIGR bonds; information about prior bank-trustees which refused to go along with the Assignment Company's plan to borrow against the trust assets; and the concerns about Pardee's potential liability if he sold the Assignment Company to a buyer who made poor investment decisions and lost the trust assets.

As part of their "due diligence" review, the Bradleys were able to obtain from Hinckley Allen a legal opinion letter assuring them specifically of the Assignment Company's right to borrow money using the trust assets as collateral.  The letter also stated:

> There are no facts known to us which give us
> reason to believe that the SSTAI Trust does
> not hold all of the assets now held by it,
> free and clear of all liens, charges and
> encumbrances and adverse claims of every kind
> or nature.

-9-

In its memorandum of law to this Court, Defendant quotes
from Pardee's deposition, explaining that Pardee met with Bradley
Sr. and "described to him in detail what we did, how we did it,
with whom we did it, and took him down to meet the managers in
the event that he wanted to continue to do the same type of
borrowing and reinvesting."  At the end of their investigation,
the Bradleys offered to buy all the Assignment Company's common
stock, and the parties agreed upon a selling price of
$16,833,400.00.  CPS agreed to participate in the sale as a
conditional indemnitor for the Bradleys.

### *Sale of the Assignment Company*

On May 20, 1997, Pardee and the Assignment Company's other
shareholders, Plaintiff Jonathan H. Pardee Charitable Remainder
Trust ("the Charitable Trust") and counterclaim co-defendants
Ogden H. Sutro and the Dunbar/Wheeler Trust (collectively
"Sellers"), entered into a Stock Purchase Agreement ("SPA") with
two Bradley-owned entities, CPS (identified as "Indemnitor" in
the SPA) and the SST Acquisition Company ("Purchaser").  The SPA
contained multiple warranties made by the Sellers: that the
Assignment Company's prior conduct was in full compliance with
the law (§ 3.20); that the information provided by the Sellers in
the Agreement was accurate (§ 3.26); that all obligations imposed
by the Settlement Agreements had been fulfilled up to the date of
the closing (§ 3.28); that the operative Master Trust Agreement,

and all previous master trust agreements, complied with the law
(§ 3.29); that the incorporated list of assets were held free and
clear of liens and encumbrances (§ 3.30); and that all previous
administration of the trusts had been in full compliance with the
law and the Settlement Agreements (§ 3.30).  According to
Defendant, the truth of these warranties and other
representations was a condition precedent of CPS's indemnity
obligations.

At the time of the closing, Sellers also asserted that the
Assignment Company had no debts or encumbrances – its only
obligations comprised the ongoing payments due the Settlement
Payees.  The Company's annual records show that its stockholder
equity was $18.8 million as of year-end 1996, and $15.5 million
one year later.

Sections 9.01 and 9.02 of the SPA are reciprocal
indemnification provisions designed to protect the buyers from
liability for the Sellers' pre-closing conduct, and to protect
the Sellers from liability for the buyers' post-closing conduct.
Section 9.02 provided for the indemnification of the Sellers, to
hold them harmless and defend them promptly for "any and all
losses, damages, costs, expenses...., including, without
limitation, reasonable attorneys' fees and other legal and
professional costs and expenses" incurred "as a result or in
connection with...any failure of the Purchaser... after the date

hereof, to carry out and perform its obligations under any agreement, instrument or other document to which the Company is now bound or hereafter becomes bound..."

Section 9.02(b)(ii) set forth time limits for some of Sellers' possible claims, including in part (d): "with respect to any failure to make required payments to the Payees due and payable after the Closing Date, December 31, 2014 except with respect to Treasury Bonds of the SSTAI Trust which are called, as to which the date shall be December 31, 2009 (sic)."

### The rise and fall of Stanwich

In order to complete the sale, the Bradleys entered into several repurchase agreements with Morgan Stanley, whereby they sold some of the Assignment Company's Treasury Bonds in exchange for the $16 million purchase price they needed to buy the Assignment Company. The name of the Assignment Company was changed to Stanwich Financial Services Corporation ("Stanwich"). After the purchase, the Bradleys continued to leverage virtually all the trust assets, entering into more repurchase agreements with Morgan Stanley for a total of $98 million,[2] which was, by September 1998, distributed in its entirety to Bradley family members and affiliates, including loans to CPS and other companies under the Bradleys' control. Defendant CPS states,

---

[2] This figure is taken from the 2003 Amended Complaint of the Official Committee of Unsecured Creditors in the subsequent Stanwich bankruptcy.

-12-

however, that it never played any role in Stanwich's operations
or investment decisions.

In 1997, Morgan Stanley notified Stanwich of its intent to
terminate the repurchase agreements by selling the Treasury
Bonds.  After giving Stanwich several extensions on its option to
repurchase the Treasury Bonds, Morgan Stanley sold the Bonds,
paid itself from the proceeds and remitted the balance to
Stanwich.  In 2000, Stanwich's financial condition was such that
it was unable to make payments to the Settlement Payees.  The
Settlement Payees then brought multiple lawsuits in California
Superior Court against Stanwich, CPS, Pardee and other former
Assignment Company shareholders, the various banks which had
served as trustees for the Assignment Company, and all other
entities involved in the structured settlements, past and
present.

### *Claims against Pardee*

One group of Settlement Payees consolidated their claims in
a class-action suit in Los Angeles Superior Court.[3]  The
complaint alleged, <u>inter</u> <u>alia</u>, that Settlement Payees' losses
were caused by the changes Pardee made to the trust agreements
enabling the Assignment Company to sell and borrow against the
Treasury Bonds.  An additional lawsuit, with the same group of

_____

[3] This case was captioned: <u>Stuber v. Merrill Lynch Pierce
Fenner & Smith, Inc., et al./In re Structured Settlement
Litigation</u>, Lead Case No. BC-244111.

defendants, alleged that Pardee had breached contractual and
fiduciary duties when, in 1993, the Assignment Company sold the
TIGR bonds without notice to, or the consent of, the Settlement
Payees.[4]  Co-defendants in these cases brought cross-claims
against Pardee, including claims for fraud, intentional and
negligent interference with contractual relations, unjust
enrichment, negligent interference with prospective economic
advantage, etc.   Stanwich soon declared bankruptcy, and, in
connection with that case, Pardee was brought into an adversary
proceeding[5] in United States Bankruptcy Court for the District of
Connecticut, in which Stanwich's creditors' committee alleged
that Plaintiffs' sale of the Assignment Company to the Bradleys
constituted a fraudulent conveyance under 11 U.S.C. § 544(b).
Facing an avalanche of claims in California and Connecticut,
Plaintiffs sought indemnification from CPS to cover legal
expenses, pursuant to section 9.02 of the SPA.  When CPS refused,
Plaintiffs filed suit in Rhode Island Superior Court in 2001.
CPS removed the case to this Court soon thereafter.

### *The Rhode Island litigation*

The dispute was the subject of extensive motion practice at
this phase, including hearings before Judge Ernest Torres on the

---

[4] The second lawsuit was captioned <u>Hawkins v. Merrill Lynch,
Pierce, Fenner & Smith, Inc.</u>, Case No. BC 279691.

[5] <u>In re Stanwich Financial Services Corp.</u>, C.A. No. 01-
50831.

issues of ripeness and abstention, hearings before Judge William
E. Smith on a summary judgment motion, hearings on discovery
before Magistrate Judge Lovegreen and Magistrate Judge David
Martin, and a conference before Judge Mary Lisi.  During this
time, CPS filed several counterclaims, making the same
allegations against Pardee that the Settlement Payees had made in
the California litigation, and adding additional counter-claim
defendants.[6]  Eventually, the case wound up before this writer
where, in 2004, it was stayed pending the resolution of the
litigation in California and Connecticut.  For details on this
travel, see Pardee v. Consumer Portfolio Services, Inc., 344 F.
Supp.2d 823 (D.R.I. 2004).

    Shortly before this Court issued its stay, the class action
suit in California was settled, with more than $90 million being
distributed to the Settlement Payees.  Plaintiffs herein did not
participate in the settlement, and the Settlement Payees' claims
against them were assigned to Bankers Trust, the largest
contributor to the settlement.  Although Bankers Trust did file

---

[6]  Ogden H. Sutro and the Dunbar/Wheeler Trust were added at
this time as counterclaim defendants by Defendant CPS.  Although
they initially retained counsel who entered an appearance prior
to the stay, that counsel has subsequently withdrawn.  Since that
time, they have been served with a Third Amended Counterclaim but
have failed to answer or respond.  No successor counsel has
entered an appearance, nor have Sutro or the Trust appeared on
their own behalf.  Consequently, in April 2012, these parties
were defaulted. Other counter and cross-claim defendants, such as
Hinckley Allen, are no longer parties to the lawsuit.

-15-

cross-claims against some non-settling defendants, it did not pursue any claims against Plaintiffs herein.  Consequently, on September 4, 2004, Pardee and the Charitable Trust were dismissed without prejudice from the class-action suit.

On February 19, 2010, the California Superior Court granted summary judgment in Pardee's favor in the second lawsuit.  In that suit, involving the TIGR bonds, the Court held that Pardee owed no duty of care, fiduciary or otherwise, to the Settlement Payees, and that he had not committed constructive fraud.

On April 6, 2011, the adversary proceedings against Pardee and the Charitable Trust in the Connecticut bankruptcy court were dismissed with prejudice, with no payment being made by or on behalf of either party.  Moreover, the bankruptcy court specified that nothing in the Chapter 11 Plan should be interpreted as precluding or interfering with Pardee or the Charitable Trust's indemnification rights against CPS or the Bradleys.

While no judgments were ever entered against Plaintiffs in any of these lawsuits, Pardee and the Charitable Trust claim they have incurred legal expenses and costs of over $50,000 each. Those claims will be left for resolution on another day.

## Analysis

### *Standard of review*

When ruling on a motion for summary judgment, the court must

look to the record and view all the facts and inferences
therefrom in the light most favorable to the nonmoving party.
Continental Cas. Co. v. Canadian Univ. Ins. Co., 924 F.2d 370,
373 (1st Cir. 1991).  Once this is done, Rule 56(c) requires that
summary judgment be granted if there is no issue as to any
material fact and the moving party is entitled to judgment as a
matter of law.

The analysis required for cross motions for summary judgment
is the same.  Scottsdale Ins. Co. v. Torres, 561 F.3d 74, 77 (1st
Cir. 2009) ("The presence of cross-motions neither dilutes nor
distorts this standard of review.").  In evaluating cross-
motions, the court must determine whether or not either party is
entitled to judgment as a matter of law based upon the undisputed
facts.  Id.

### *CPS's counterclaims*

The gravamen of CPS's counterclaims is that, at the time of
the sale of the Assignment Company, Plaintiffs misrepresented key
information about its authority to engage in financial
transactions using the trust assets; and that these
misrepresentations render the SPA void, and the indemnification
agreement unenforceable.  As these claims attack the fundamental
validity of the SPA, rather than its interpretation, the Court
will address these issues before reaching Plaintiffs' motion for
summary judgment on the Complaint.  Plaintiffs have moved for

-17-

summary judgment on the counterclaims; however, Defendant has not cross-moved, arguing that there are material factual issues in dispute that made summary judgment improper.

CPS brings six counterclaims: Count I for fraud and intentional misrepresentation; Count II for negligent misrepresentation; Count III seeks indemnification from Plaintiffs pursuant to Section 9.01 of the SPA because of Plaintiffs' misrepresentations at the time of the closing; Count IV seeks indemnification based on Plaintiffs' negligent failure to perform duties arising out of the SPA; Count V seeks indemnification based on equity; and Count VI seeks a declaratory judgment that CPS is entitled to indemnification from Plaintiffs.

### *The alleged misrepresentations*

CPS alleges that Plaintiffs knowingly or negligently made misrepresentations, in order to induce CPS to participate as an indemnitor in the purchase of the Assignment Company. The alleged misrepresentations include that the Assignment Company had the legal and contractual right to borrow against the Treasury Bonds; that the modifications of the trust agreements made by Pardee were legal and in full compliance with the Assignment Company's contractual obligations to the Settlement Payees; and that the Settlement Payees had no claims against the Assignment Company or the trust assets as of the date of the closing.

-18-

For the purpose of analyzing Plaintiffs' motion in the light most favorable to CPS, the Court assumes that Plaintiffs made the representations as alleged.  Nevertheless, CPS's claims fail, as a matter of law, because they lack two elements of the requisite *prima facie* case for misrepresentation: reliance and causation. In order to make a claim for intentional misrepresentation or fraud, a plaintiff must establish that the defendant knowingly misrepresented a material fact, with the intent not only to deceive but also to induce the plaintiff to rely on the misrepresentation to his detriment.  Fleet Nat. Bank v. Anchor Media Television, 831 F.Supp. 16, 38 (D.R.I. 1993) (citing East Providence Loan Co. v. Ernest, 103 R.I. 259, 263, 236 A.2d 639, 642 (1968).  If the misrepresentation is made negligently, it must be made without knowledge as to its truth or falsity, under circumstances where the defendant should have known of the statement's falsity.  As with fraud, the representation must be made in order to induce reliance.  Mallette v. Children's Friend and Service, 661 A.2d 67, 69 (R.I. 1995).

Because of the roles that the Bradleys played in the management and ownership of CPS, the information obtained for them by their attorneys during the due diligence phase of the purchase of the Assignment Company may be imputed to Defendant CPS.  See Cook v. American Tubing & Webbing Co., 28 R.I. 41, 77, 65 A. 641, 655 (1905); U.S. v. Bank of New England, N.A., 821

-19-

F.2d 844, 856 (1st Cir. 1987).  Charles Bradley Jr. haS served as
CPS's president and chief executive officer since the company's
founding.  At the time of the sale, Charles Bradley Sr. was its
chairman of the board.

### *Reliance*

It is a well-settled point of law that there is no liability
on the part of the seller when the buyer enters into the
transaction based on an independent investigation, unless the
seller intentionally prevents the investigation from being
effective.  <u>French v. Isham</u>, 801 F.Supp. 913, 921 (D.R.I. 1992)
(<u>citing</u> <u>Restatement (Second) of Torts</u> § 547 (1976): "Thus one who
has fully inspected a house before buying it ordinarily cannot
claim that he was deceived by a misrepresentation of the
condition of the ceilings that was apparent to any one taking the
trouble to look at them....").

The Bradleys and CPS entered into the purchase of the
Assignment Company with their eyes wide open, having conducted an
extensive independent investigation.  The Bradleys' attorneys
spent five days reviewing all of the Assignment Company records,
including the original Settlement Documents and all versions of
the trust agreements.  Consequently, CPS was aware of the
Assignment Company's ongoing obligations to the Settlement
Payees; it knew that Pardee had modified the trust agreements,
switched out the recalcitrant bank-trustees and fundamentally

-20-

altered the arrangements from their original forms as irrevocable spendthrift trusts.

Defendant complains that Pardee's failure to produce Hinckley Allen's internal memoranda prior to the closing prevented it from conducting an effective independent investigation.  The Hinckley Allen documents, obtained by CPS during discovery in later litigation, revealed the attorneys' concerns about some of Pardee's maneuvers, as well as their commitment to ensuring that the trust modifications and other changes did not leave Pardee exposed to potential liability. Even without the benefit of Hinckley Allen's internal memoranda, these concerns obviously did arise for the Bradleys during their due diligence review, because, before the sale, they requested and received an opinion letter on these issues from Hinckley Allen.

The Bradleys and their attorneys were also able to review letters from Plaintiffs' California attorneys, Ross & Sacks, opining on the legality of the trust modifications, and documentation from the litigation with Wells Fargo, when the California judge ruled that the trustee could not be changed without the consent of the Settlement Payees.

The Bradleys understood the nature of the Assignment Company's activities, past and present, and understood, as well, the nature of the ongoing obligations to the Settlement Payees.

The Bradleys entered into the purchase of the Assignment Company wittingly and willingly, having, in the words of the Restatement, "taken the time to look at the ceiling."  CPS was motivated to serve as indemnitor by the prospect of an influx of capital to its company, and, in fact, it received a multimillion dollar loan soon after the Bradleys purchased the Assignment Company.  The facts, as provided by CPS, support the conclusion that CPS and the Bradleys did not rely on Plaintiffs' representations, but instead conducted an independent investigation of the Assignment Company and decided thereafter to purchase the company.

### *Causation*

CPS's counterclaims for negligent and fraudulent misrepresentation fail for the additional reason that there is no evidence to demonstrate that the alleged misrepresentations were the proximate cause of CPS's damages.  In fact, all the evidence demonstrates that the Bradleys' own investment strategy was to blame for Stanwich's insolvency and consequent failure to pay the Settlement Payees, which led to the litigation, and ultimately triggered CPS's indemnification obligations.

Rhode Island law is clear that an independent intervening negligent act breaks the chain of tort causation.  The Rhode Island Supreme Court case of Clements v. Tashjoin is illustrative, 92 R.I. 308, 168 A.2d 472 (1961).  In that case, defendant Tashjoin visited a Providence mental hospital and left

his car unlocked with the keys in the ignition in the hospital's parking area.  While the car was unattended, it was stolen by a patient, who drove it off the grounds and eventually caused an accident, resulting in injuries to Clements.  It turned out that state law required that a driver remove the key from the ignition when leaving a car unattended.  92 R.I. at 310, 168 A.2d at 473. Although Tashjoin's violation of the Rhode Island statute may have provided *prima facie* evidence of negligence, the Supreme Court affirmed the trial judge's holding:

> The trial justice sustained the demurrer substantially on the ground that an independent intervening act of a third person broke the chain of causation between the negligence of defendant, if any, and the plaintiff's injury.  He based his decision on the ground that defendant was not bound to anticipate that a thief would steal his automobile and negligently operate it so as to collide with another vehicle on the highway.

92 R.I. at 310-311, 168 A.2d at 473. <u>See also</u> <u>Almeida v. Town of North Providence</u>, 468 A.2d 915, 917 (R.I. 1983); <u>Travelers Ins. Co. v. Priority Business Forms, Inc.</u>, 11 F.Supp.2d 194, 200 (D.R.I. 1998).

Pardee's scheme to alter the trusts and siphon the money out of the trust assets for the benefit of his other enterprises was greedy and risky.  However, during the time that Pardee owned the Assignment Company, he made it work: all payments to the Settlement Payees were made on schedule and in the proper amount.

-23-

Pardee's dubious scheme did not unravel until after the Bradleys purchased the Assignment Company, as they continued to borrow large sums of money against the trust assets over a two-year period, and invest that money into what were arguably more risky enterprises than those chosen by Pardee.  Analogizing with the Tashjoin case, Pardee is the careless driver who left his car unlocked with the keys in the ignition on the grounds of a mental hospital.  The Bradleys are the mental patient who then took the car for a joy-ride.

Had the Bradleys continued to make the proper payments to the Settlement Payees, the two California lawsuits would not have been filed, and had the Bradleys operated Stanwich more cautiously, it would not have gone into bankruptcy.  Had this litigation been avoided, CPS would not have incurred the loss it complains of today.

This Court's conclusions are supported by the holdings of the California Superior Court, as well as the Connecticut bankruptcy court.  While none of those cases resulted in the wholesale exoneration that Pardee argues is binding on this Court; at the same time, neither did any of those lawsuits result in any liability for Pardee.  Consequently, none of this other litigation served to establish that Pardee's warranties and representations were in fact false.

For the reasons explained above, the Court grants

Plaintiffs' motion to dismiss Defendant CPS's first and second counterclaims.  Because CPS has failed as a matter of law to establish that Plaintiffs made any actionable misrepresentations or fraudulent statements in connection with the sale of the Assignment Company, the Court also grants Plaintiffs' motion for summary judgment on counterclaims III, IV, V and VI, as those claims are not viable absent a finding of tortious misrepresentation.  Likewise, the Court, *sua sponte*, dismisses CPS's counterclaims against defaulted counterclaim defendants Ogden Sutro and the Dunbar/Wheeler Trust because they made no representations to the Bradleys or to CPS independent of those made by Plaintiffs.

### *Plaintiffs' Complaint*

Plaintiffs also move for summary judgment on their Complaint.  The Complaint has three counts, two counts for breach of contract for CPS's failure to indemnify Plaintiffs for their legal expenses in the California litigation (I) and the Connecticut bankruptcy litigation (II), and a third count for declaratory judgment concerning CPS's obligations under the indemnity provision of the SPA.  Defendant has cross-moved for summary judgment on these counts.

As explained previously, the indemnification provision was included in the SPA, pursuant to which Pardee and the other shareholders sold the Assignment Company to the Bradleys.  CPS

served as the indemnitor.  Section 9.02 provides:

Section 9.02 <u>Indemnification by the Purchaser, the Company and the Indemnitor.</u>

(a)   <u>The Purchaser, the Indemnitor and, from and after the Closing Date, the Company hereby indemnify and hold each of the Sellers, Sutro and each of the Sellers' respective trustees and agents (collectively, the "Seller Indemnified Parties") harmless from and against, and agree to defend promptly each of the Seller Indemnified Parties for, any and all losses,</u> damages, costs, expenses, fines, penalties, settlement payments and expenses, liabilities, obligations and claims of any kind, including, without limitation, reasonable attorneys' fees and other legal and professional costs and expenses (hereinafter referred to collectively as "Seller Losses"), <u>that any of the Seller Indemnified Parties may at any time suffer or incur, or become subject to, as a result of or in connection with the following (the "Seller Claims")</u>: (i) any breach or inaccuracy of any of the representations and warranties made by the Purchaser and/or the Indemnitor in or pursuant to this Agreement; (ii) any failure of the Purchaser and/or the Indemnitor to carry out, perform, satisfy and discharge any of its or their covenants, agreements, undertakings, liabilities or obligations under this Agreement or under any of the documents and instruments delivered by the Purchaser and/or the Indemnitor pursuant to this Agreement; (iii) any liability for the payment by the Purchaser, the Indemnitor and/or the Company of federal, state or foreign taxes arising from and after the date hereof; (iv) any failure of the Purchaser, the Indemnitor and/or the Company, after the date hereof, to carry out and perform its obligations under any agreement, instrument or other document to which the Company is now bound or hereafter becomes bound, (v) any fraudulent behavior by the Company, the Purchaser and/or the Indemnitor arising after

-26-

the date hereof, <u>(vi) any claim that the</u>
<u>purchase and sale of the Shares constitutes a</u>
<u>fraudulent transfer or fraudulent conveyance</u>
<u>under applicable federal or state law and</u>
<u>(vii) any failure to fulfill any obligations</u>
<u>of the Sellers, the Company and/or the STTAI</u>
<u>Trust to any Payee as and when due at any</u>
<u>time after the Closing Date.</u>

(emphasis added).

When the California class action litigation began,
Plaintiffs sought indemnification from CPS to cover their defense
costs in May 2001.  CPS denied that it was obligated to indemnify
Pardee or the Charitable Trust.  In October of 2002, Plaintiffs
requested that CPS indemnify them in connection with the
bankruptcy litigation, and CPS again refused.  In September 2004,
Pardee made a third request to CPS, this time for indemnification
for the California TIGR bond litigation.  This Court stayed
Plaintiffs' complaint in 2004, pending the outcome of the other
litigation.  Plaintiffs' claims are now ripe for review.

Plaintiffs argue that the indemnification provision is
straightforward and unambiguous, and clearly encompasses their
claims.  Defendant asserts that Plaintiffs' claims fall outside
the scope of the indemnification provision because the
allegations against Plaintiffs made in the California and
Connecticut litigation resulted from Plaintiffs' own conduct, and
were not caused by Stanwich's actions.  Consequently, Defendant
argues, Plaintiffs' claims did not arise "as a result or in

-27-

connection with"... the Bradleys' "failure to fulfill any obligations of...the Company...to any Payee as and when due at any time after the Closing Date."  Instead, Defendant asserts, Plaintiffs' loss arose because they were sued for dissolving and modifying the Trust Agreements during their tenure as owners of the Assignment Company.

An examination of the complaints in the California litigation supports Defendant's argument that Plaintiffs were sued because of actions taken in the years before the Assignment Company was sold to the Bradleys.  Nonetheless, the Court is not persuaded that the claims against Plaintiffs are not covered by the broad and inclusive terms of the indemnification provision.

Under Rhode Island law, "contract terms must be assigned their plain and ordinary meaning." Rivera v. Gagnon, 847 A.2d 280, 284 (R.I. 2004); Vaccaro v. E. W. Burman, Inc., 484 A.2d 880, 881 (R.I. 1984).  Indemnity agreements, despite their function of assigning tort liability, are interpreted according to contract principles. A and B Construction, Inc. v. Atlas Roofing and Skylight Co., 867 F. Supp. 100, 105 (D.R.I. 1994). While indemnity agreements are strictly construed against the party seeking indemnification, they may be designed to transfer liability even from a negligent party to a non-negligent one if the language is specific and unequivocal. Sangermano v. Roger Williams Realty Corp., 22 A.3d 376, 377 (R.I. 2011); Dower v.

Dower's Inc., 100 R.I. 510, 511-12, 217 A.2d 437, 438-39 (1966).
More commonly, an indemnity agreement is used to ensure that one
who has been exposed to liability as the result of another's
wrongful act is able to recover from the wrongdoer. Muldowney v.
Weatherking Products, Inc., 509 A.2d 441, 443 (R.I. 1986).

The indemnity provision contained in the SPA is broad and
inclusive, starting with a list of potential losses, including
legal expenses, that could potentially be incurred by Plaintiffs
"as a result of or in connection with" seven enumerated
scenarios. Those scenarios include, in subsection (iv), the
specific eventuality that came to pass, wherein the "Purchaser"
fails "to carry out and perform its obligations under any
agreement, instrument or other document to which the Company is
now bound or hereafter becomes bound;" as well as, in subsection
(vii), any failure "to fulfill any obligation of the Sellers, the
Company and/or the SSTAI Trust to any Payee[7] as and when due at
any time after the Closing Date." In addition, the indemnity
provision also expressly includes, in subsection (vi), indemnity
for the Sellers for "any claim that the purchase and sale of the
Shares constitutes a fraudulent transfer or fraudulent conveyance
under applicable federal or state law..."

---

[7] The SPA previously defined "Payee" in Section 3.28, as
this writer has also used it, to identify those individuals
receiving periodic payments as set forth in the Settlement
Documents.

Plaintiffs incurred significant expenses when Stanwich defaulted on its obligations to the Settlement Payees, which eventually triggered Stanwich's bankruptcy, causing further legal expense to Plaintiffs.  By its clear and unambiguous terms, the SPA's indemnity provision covers these losses.  No exception is created because the claims brought by the Settlement Payees or the Stanwich Creditors' Committee against Plaintiffs stemmed from Plaintiffs' conduct.  Therefore, the Court concludes that, as a matter of law, Defendant is obliged to honor the indemnity provision.  The Court grants Plaintiffs' motion for summary judgment on all three counts of their Complaint, and denies Defendant's cross motion for summary judgment.

## Conclusion

For the reasons stated above, this Court grants summary judgment in favor of Plaintiffs on their Second Amended Complaint, and denies Defendant's cross motion for summary judgment.  In addition, the Court grants Plaintiffs' motion for summary judgment on Defendant's counterclaims.  By its own authority pursuant to Fed. R. Civ. P. 56(f), this Court summarily dismisses the counterclaims against Counterclaim Defendants Ogden H. Sutro and the Dunbar/Wheeler Trust.  Today's ruling is limited to the issue of liability only.

The Court will issue a scheduling order concerning the issue of damages and set a date for a jury trial on that issue.  No

-30-

judgment will be entered until all issues are resolved.

It is so ordered.


/s/Ronald R. Laqueux
Ronald R. Laqueux
Senior United States District Judge
February    13    , 2013